

**FILED**
February 21, 2024 05:15 PM
SX-2016-CV-00068
**TAMARA CHARLES**
**CLERK OF THE COURT**

IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

MARSHA JAGRUP, )
)
Petitioner, )
)
v. )
)
JUAN F. LUIS HOSPITAL & MEDICAL )
CENTER and THE COMMISSIONER OF THE )
VIRGIN ISLANDS DEPARTMENT OF LABOR, )
)
Respondents. )

**CIVIL NO. SX-2016-CV-00068**

PETITION FOR WRIT OF REVIEW

**2024 VI SUPER 8U**

## MEMORANDUM OPINION AND ORDER

¶ 1     By Order Granting Petition for Judicial Review entered May 26, 2016 ("Order Granting Writ"), the Court granted Petitioner Marsha Jagrup's Petition for Judicial Review, timely filed on February 12, 2016.[1] The Petition sought relief from the January 12, 2016 Decision of Chief Administrative Law Judge June Austin ("ALJ"), affirming the initial determination of the Adjudicator within the Division of Unemployment Insurance of Respondent Commissioner of the Virgin Islands Department of Labor ("DOL" or "Department"). Therein, in deciding Petitioner Jagrup's internal appeal of the Adjudicator's determination to deny Jagrup's application for unemployment benefits, the ALJ found that Jagrup was disqualified from receiving unemployment insurance benefits due to misconduct. For the reasons noted below, the Decision will be affirmed.

¶ 2     Respondent Juan F. Luis Hospital and Medical Center, ("JFL") filed an Opposition to the Petition for Writ of Review on May 23, 2016, denied by Order of May 26, 2016. The same date, the Court's Order Granting Writ established a briefing schedule, by which Petitioner was ordered to file and serve "Petitioner's Brief" within thirty (30) days after DOL's filing and service of the certified copy of the record of the proceedings, following which JFL and DOL would then have thirty (30) days to file and serve "Respondents' Brief."

---

[1] The Order Granting Writ required the Department of Labor to produce on or before July 1, 2016, a "record of the proceedings in the matter concerning the claim for unemployment insurance benefits.". By letter of June 20, 2016, the Department of Labor transmitted its original file and original transcript of the Unemployment Insurance benefit Appeal Hearing.

¶ 3     When Petitioner failed to timely file her brief, on May 2, 2017, DOL filed its Motion to Dismiss for failure to prosecute. By Memorandum Opinion and Order entered June 21, 2017, the Court denied DOL's Motion to Dismiss, but required Jagrup to show cause why it should permit an extension to file her brief notwithstanding her noncompliance with the Court's scheduling order. In her July 10, 2017 Response to the Court's Order to Show Cause, Jagrup explained that the delay was partly due to a change in counsel and requested additional time to file her brief. By Order entered May 9, 2018, the Court excused the delay and granted in part the request for additional time and ordered that the parties adhere to the briefing deadlines prescribed by Virgin Islands Rule of Civil Procedure 91(f)-(h) (twenty days for petitioner's brief and respondents' briefs; reply brief allowed only by court order).

¶ 4     On May 30, 2018, Petitioner Jagrup filed her brief, followed on June 18, 2018, by DOL's Memorandum of Points and Authorities in Support of Affirming DOL's Denial of Employment Benefits. Respondent JFL did not file a brief. The Court finds that the ALJ's Decision is supported in the record by substantial evidence and will affirm the Decision.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 5     On February 12, 2016, Petitioner filed her Petition, asking the Court to review and vacate the ALJ's January 12, 2016 Decision in *MARSHA JAGRUP v. JFLH.,* (V.I. App. No. 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). The record[2] shows that JFL hired Jagrup in July 2014 as a full-time Registered Nurse assigned to the Surgical/Medical Unit, working on a Flex-time schedule. At the time of her termination, Jagrup earned $63,000 annually.

¶ 6     The *Gov. JFL Hospital & Medical Center Employee Code of Conduct and Compliance Guidelines* ("Employee Manual") was the manual that sets out regulations and expectations of conduct, binding upon Jagrup and other JFL employees. The Employee Manual

---

[2] The "record" herein includes the Gov. JFL Hospital & Medical Center Employee Code of Conduct and Compliance Guidelines, the Gov. JFL Hospital & Medical Center Employee Handbook, the Employee Acknowledgment Statement signed by Jagrup, Austin Thomas's "My Living Will," the Counseling and Corrective Action Form regarding the June 12, 2015 incident involving Jagrup, the June 16, 2015 letter placing Jagrup on administrative leave, Jagrup's termination letter dated August 17, 2015, the Virgin Islands Unemployment Separation Fact Finding Statement signed by Jagrup, the initial determination by the Department of Labor's Adjudicator, the redetermination by the Department of Labor's Adjudicator, the transcript of the proceedings before the ALJ, and the ALJ's January 12, 2016 Decision.

listed on pages 9 and 10 a non-exclusive list of potential violations under the headings: *Conflict of Interest* and *Business Courtesies, Gifts and Customer Supplier Relations.*

¶ 7      The Employee Manual, under the *Conflicts of Interest* heading, defined a conflict of interest as an activity, influence, or relationship that "impairs, or even gives the appearance of impairing, one's ability to make objective and fair decisions in the performance of his/her job." The Guidelines further admonished employees not to place themselves in any situation that might lead them to place their personal or financial interests ahead of those of JFL. The Employee Manual conceded that conflicts of interest may arise despite an employee's best efforts to avoid such situations, but that the correct course of action for an employee to take in that instance is to disclose the matter to his or her supervisor.

¶ 8      Furthermore, under the *Business Courtesies, Gifts and Customer Supplier Relations* heading, the Employee Manual permitted JFL employees to accept gifts with a total value of $25.00 or less in any one year from any individual or organization with a business relationship with JFL. The Employee Manual identified Physicians practicing in the hospital or facilities as being in a business relationship with JFL, but did not so reference Nurses, LPNs, or RNs as suppliers, customers, or individuals who have a business relationship with JFL for the purposes of gifts or business courtesies.

¶ 9      In pertinent part, a section entitled *Policy Headings* stated that as agreed by signing the Employee Manual, the employee should ask "do I contact my supervisor or the Compliance Department when I am not sure that I can keep a particular gift that I have been offered ...". On July 22, 2014, Jagrup signed an Employee Acknowledgement Statement agreeing to comply with the standards contained in the policies and procedures of the Employee Manual.

¶ 10     Jagrup was assigned to provide care for Austin Thomas, a JFL patient recovering after surgery in the Surgical/Medical Unit. On May 13, 2015, at the request and direction of Thomas from his hospital bed, Jagrup wrote out the words contained in Thomas's "My Living Will" ("Living Will"). As set out therein, all the real and personal property in Thomas's possession at his death was to be conveyed to Jagrup. His last dictated words stated that his wish was to be cremated. The document was witnessed by two individuals. Thomas was subsequently released from JFL, but shortly thereafter returned to JFL's Intensive Care Unit where he soon passed away.

¶ 11     Jagrup had called JFL's Risk Management official at some point during the writing of the Living Will, but only to inquire about how to have the will properly executed. Jagrup never informed Risk Management of the context surrounding the Living Will, who wrote it and the fact that she benefited from it, and Jagrup never informed her superiors that she assisted Thomas in drafting his Living Will.

¶ 12     Jagrup carried out Thomas's wishes as set forth in his Living Will that a local funeral home would cremate his body on death, a directive carried out when Thomas's remains were cremated.

¶ 13     On June 12, 2015, a member of JFL's management received a verbal complaint from a neighbor of Thomas, stating that Jagrup improperly had her patient Thomas sign over all his assets to her. Thereafter, JFL's management commenced an investigation.

¶ 14     On June 15, 2015, JFL prepared a JFL Employee Counseling and Corrective Action Form outlining Jagrup's inappropriate behavior and triggering further investigation by JFL and the initiation of disciplinary action against Jagrup. On June 15, 2015, Jagrup was placed on Administrative Leave with pay, pending the outcome of JFL's investigation.

¶ 15     By correspondence dated August 17, 2015, JFL advised Jagrup that she was terminated from her employment as a Registered Nurse in the Medical/Surgical Unit at JFL. The correspondence cited Jagrup's violation of JFL's policies and procedures contained in the "Code of Conduct" as the reason for her termination.

¶ 16     Jagrup did not challenge her termination, but on October 8, 2015, filed for unemployment insurance benefits. On November 9, 2015, an Adjudicator determined that Jagrup was not entitled to receive such benefits because her actions, as reported by JFL and pursuant to V.I. Code Ann. tit. 24, § 304(b)(3), "demonstrated a disregard of the standards of behavior that the employer had a right to expect." Disagreeing with the Adjudicator's decision, Jagrup filed a notice of appeal under § 306(b) on December 2, 2015.

¶ 17     On December 14, 2015, ALJ Austin presided over the appeal hearing and heard testimony from Marsha Jagrup, Patrick Piper, a patient who testified on behalf of Jagrup, as well as Frank Abednego, Chief Human Resources Officer, Justa Encarnacion, Chief Nursing Officer, and Dyma Williams, Corporate Compliance Officer, who all appeared as witnesses for employer

JFL. After hearing the testimony and considering the evidence, on January 12, 2016, the ALJ issued her Decision finding that Jagrup was correctly terminated for misconduct under § 304(b)(3), citing *Jackman v. Heyliger*, 20 V.I. 536 (D.V.I. 1984).[3] Jagrup filed her Petition in this Court on February 12, 2016.

¶ 18    By her Petition, Petitioner asks the Court to reverse the ALJ's January 12, 2016 Decision denying Petitioner unemployment benefits. On May 26, 2016, the Court entered its Order Granting Writ, ordering the parties to submit briefs. Following procedural delays, on May 30, 2018, Petitioner filed her Petitioner's Brief, arguing that the Court should reverse the ALJ's January 12, 2016 Decision for the following reasons: (1) the ALJ's finding that Jagrup engaged in misconduct under § 304(b)(3) is not based on substantial evidence, and (2) the Decision by the ALJ is contrary to the public policy set forth in the enabling statute.

## LEGAL STANDARD

¶ 19    V.I. Code Ann. tit. 24, § 306(e)(1) allows a party aggrieved by a hearing examiner's decision to "initiate[ ] judicial review by filing in the [Superior] Court of the Virgin Islands a petition for review within 30 days after the hearing examiner's decision has been mailed to each party's last known address, or otherwise delivered to him." *Id.* § 306(e)(1). Jagrup timely filed the Petition on February 12, 2016. Therefore, the Superior Court has jurisdiction over the Department of Labor ALJ's January 12, 2016 Decision.

¶ 20    In granting a petition for review under § 306(e)(1), the reviewing court's jurisdiction "shall be confined to questions of law, and, in the absence of fraud, the findings of fact by the hearing examiner, if supported by substantial evidence regardless of statutory or common-law rules, shall be conclusive." § 306(e)(3).

¶ 21    Where the Legislature has not explicitly required courts to apply a more deferential standard of review, the Superior Court exercises plenary review of an agency's conclusions of law.

---

[3] In *Jackman*, the District Court held: "It is true that not every violation of employment procedure which constitutes a proper basis for an employee's dismissal constitutes misconduct warranting denial of unemployment benefits. As used in the unemployment compensation statute misconduct means an act of wanton or wilful disregard of an employer's interests, a deliberate violation of the employer's rules, a disregard for the standards of behavior which an employer has the right to expect from an employee, or negligence indicating an intentional disregard of the employer's interest or of employee's duties and obligations to the employer." 20 V.I. at 538-39 (citations omitted).

*Bryan v. Fawkes*, 61 V.I. 201, 226-27 (V.I. 2014). In the instant case, because the Legislature did not require a specific standard of review under § 306(e)(3) for the ALJ's conclusions of law, the Court reviews those determinations *de novo*. Section 306(e)(3) does require that the Superior Court review all factual findings under the substantial evidence standard.

## DISCUSSION

### A. The ALJ's finding that Jagrup's actions constituted misconduct under section 304(b)(3) is based on substantial evidence.

¶ 22    Jagrup contends that the ALJ's Decision that her employment with JFL was terminated due to misconduct under the meaning of section 304(b)(3) was not based on substantial evidence. The Court finds to the contrary, that the ALJ's determination was based on substantial evidence. V.I. Code Ann. tit. 24, § 304(b)(3) disqualifies an insured worker from receiving waiting-week credit or benefits for any week of employment if she "was discharged for misconduct connected with [her] most recent work." An employee will not be denied unemployment compensation benefits unless the employee was discharged due to "misconduct," defined as

> an act of wanton or willful disregard of an employer's interest, a deliberate violation of the employer's rules, a disregard for the standards of behavior which an employer has the right to expect from an employee, or negligence indicating an intentional disregard of the employer's interest of the employee's duties and obligations to the employer.

*Jackman v. Heyliger*, 20 V.I. at 537.

¶ 23    "Misconduct" is a question of law reviewable by this Court. Where an employee appeals an agency decision denying compensation benefits, the Court must decide whether the agency's decision that Petitioner engaged in disqualifying "misconduct" is supported by substantial evidence. *Id.* In determining whether there is substantial evidence to support the agency's findings, the Court must examine the testimony in the light most favorable to the prevailing party [JFL], giving that party the benefit of any inference, which can be drawn logically and reasonably from the evidence. *See HH Tire & Battery v. Crooke*, 2005 V.I. LEXIS 44, at *5 (V.I. Super. Ct. Aug. 10, 2005).

¶ 24    Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Virgin Islands Coalition of Citizens with Disabilities, Inc./St. Thomas v. Gov't of the Virgin Islands*, 47 V.I. 315, 320-21 (V.I. Super. Ct. 2005) (quoting Black's

Law Dictionary (8th ed. 1999)). If "no reasonable fact finder could make [a particular] finding on the administrative record," then an administrative record is not based on substantial evidence. *Dia v. Ashcroft*, 353 F.3d 228, 249 (3d Cir. 2003). Furthermore, simply because the Court could reach a different conclusion based on the factual record before it does not mean that the record is unsupported by substantial evidence. *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 619 (1966). That is, "substantial evidence allows for the possibility of drawing two inconsistent conclusions." *V.I. Coalition of Citizens with Disabilities*, 47 V.I. at 320. Accordingly, if an administrative decision is supported by substantial evidence, it is not subject to reversal simply because it might also support a contradictory finding. *Port Norris Exp. Co., Inc. v. I.C.C*, 697 F.2d 497 (3d Cir.1982) (citing *Consolo v. FMC*, 383 U.S. at 620).

¶ 25    When the Court applies the substantial evidence test, it is required to consider the "whole record." *La Vallee Northside Civic Ass'n v. Virgin Islands Bd. of Land Use Appeals*, 30 V.I. 9, 16 (V.I. Terr. Ct. 1994) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951)). In other words, the Court must do more than simply find a justification for the agency's decision, it must also determine whether the agency's ruling was reasonable in light of all the evidence presented. *Id.* "The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." *Gov't of the Virgin Islands v. Public Employee Relations Board*, 22 V.I. 12, 23 (V.I. Terr. Ct. 1986). Finally, when the Court reviews an agency record for lack of substantial evidence, it must be conscious of the ALJ's opportunity to appraise the credibility and consider the weight of the evidence in the first instance. *See Marte De Velez v. V. I. Dept. of Labor*, 2018 V.I. LEXIS 166, at *5 (V.I. Super. Ct. July 25, 2018).

¶ 26    Here, the ALJ heard and considered the testimony of five individuals: Petitioner Jagrup, JFL patient Patrick Piper who testified on behalf of Jagrup, as well as Abednego, Encarnacion, and Williams who testified on behalf of JFL. The transcript of the hearing clearly demonstrates that the ALJ kept the proceeding focused on the issues at hand. For example, she stopped counsel for Petitioner from going down the line of questioning concerning the cremation of Thomas, challenging its relevance, and stating, in relevant part: "the issue is whether or not Miss Jagrup engaged in misconduct.... I respectfully understand that you're attempting to lay a foundation – a connection, a nexus between Miss Jagrup's relationship with ... Mr. Thomas," but,

the ALJ correctly noted the hearing's focus: "we have to keep the scope of ... the facts relevant to my findings as to whether or not she [Jagrup] engaged in misconduct." Tr. at 42-43.

¶ 27    In addition, the ALJ considered the relevant sections of the Employee Manual that JFL accused Jagrup of violating, including the prohibition against accepting gifts above a certain value or placing one's personal or financial interests ahead of those of JFL. The ALJ further considered the Employee Acknowledgment Statement, signed by Jagrup, indicating that she agreed to comply with the standards contained in the policies and procedures of the Employee Manual.

¶ 28    Furthermore, the ALJ considered patient Piper's testimony, rightly noting the high quality and "praiseworthy" nursing care Jagrup had provided to Thomas. However, the ALJ also took notice of Jagrup's testimony and her contradictory actions after the death of Thomas. Jagrup claimed that she had no intention to carry out the terms of the Living Will and that she had merely written it to calm the patient and to put him at ease. Yet she failed to disclose to her employer her involvement in writing Thomas's Living Will and she traveled to Thomas's home to look for his house keys. The ALJ found such conduct demonstrative of Jagrup's intent to implement the terms of the Living Will, conduct that was contrary to the interests and expectations of her employer. The ALJ found that these actions constituted misconduct under § 304(b)(3). The testimony and documentary evidence considered by the ALJ, coupled with the ALJ's corroboration of the facts during direct examination of the parties at the hearing, supports the ALJ's conclusion, and a reasonable person could reach the same conclusion if presented with the same evidence.

¶ 29    In her brief, Jagrup quotes swaths of dialogue from the hearing transcript without analysis supporting her claim that the ALJ's finding was not based on substantial evidence. Ultimately, Jagrup asserts that (1) she provided her patients with good care, (2) sought advice from her supervisors when confronted with the issue of Thomas's intent to bequeath to her his property, and that (3) she only accepted the Living Will to appease Thomas, but never took any action to gain ownership of his property after his death.

¶ 30    Jagrup was not accused of misconduct concerning the quality of professional care she provided as a nurse to her patients. JFL never raised the issue of Jagrup's work performance.

In fact, the ALJ made a finding, based on the evidence in the record, that Jagrup provided her patients, including Thomas, with excellent care.

¶ 31    The Court finds there is substantial evidentiary support for the ALJ's conclusion that Jagrup's assertions that she sought advice from her supervisors regarding the Living Will and that she only wrote and accepted it in order to appease patient Thomas were disingenuous. Perhaps the most appropriate response to these assertions is summarized by the following query: Why would Jagrup seek advice from her supervisors regarding the execution of the will if Jagrup had no intention of executing the will in the first instance? The ALJ found no reasonable explanation to this question in Jagrup's testimony nor anywhere else in the record before her, and neither does this Court on review.

¶ 32    Thus, when Jagrup accepted Thomas's invitation to assist him in writing out his Living Will, and then tried to execute its terms, she was putting her interests in direct conflict with those of her employer JFL and its duty of care to decedent Thomas. Such a conflict of interest, even if initiated by Thomas out of a well-meaning, but misinformed desire to help a caring nurse, was the inevitable result of Jagrup's actions, in clear violation of JFL's policies to which Jagrup had previously agreed to adhere and abide by. Therefore, the Court finds Jagrup's assertions to be baseless and unpersuasive and finds the ALJ's conclusion that Jagrup engaged in misconduct under section 304(b)(3) to be supported by substantial evidence in the record.

### B. Jagrup's contention that the ALJ's Decision is contrary to the public policy set forth in 24 V.I.C. § 301 is meritless.

¶ 33    Finally, Jagrup contends that the ALJ's Decision is contrary to the public policy set forth in 24 V.I.C. § 301. Specifically, Jagrup argues that since 24 V.I.C. § 301 sets forth a public policy of protecting citizens from the economic insecurity attending unemployment, and because Jagrup was an unemployed parent of three children when she came before the ALJ at her unemployment benefits hearing, the ALJ's decision to deny Jagrup benefits violated the law. The Court finds Jagrup's contention meritless.

¶ 34    The stated purpose of the Virgin Islands Unemployment Insurance Act ("UIA"), which includes Section 304(b)(3), is to establish a general unemployment fund to help "sustain the

morale and conserve the skills and standards of living of those who became unemployed, by enabling them to meet their essential expenses." 24 V.I.C. § 301.

¶ 35    Title 24, section 306 of the Virgin Islands Code—which authorizes administrative appeals of initial determinations of unemployment insurance eligibility—provides that after a hearing, "a hearing examiner shall make findings and conclusions promptly and on the basis thereof affirm, modify, or reverse the Commissioner's determination or redetermination." 24 V.I.C. § 306(e). The statutory conditions for receipt of benefits are set forth in Section 304, and these conditions, along with the case law which has interpreted them, are what the ALJ uses to guide her determinations regarding a worker's unemployment benefits eligibility.

¶ 36    In the instant case, if the Court were to follow Petitioner Jagrup's logic, then any insured worker who finds themself unemployed, irrespective of how they came to be unemployed, would be eligible for unemployment insurance benefits. Unemployment insurance benefits' eligibility would thus be a foregone conclusion for anyone and everyone who finds themselves newly unemployed, and any ruling denying benefits would be violative of the statutory scheme. However, it is this very same statutory scheme of the UIA, which Jagrup contends was violated by the ALJ's Decision, that contains the relevant conditions under Section 304 for receiving unemployment insurance benefits. Jagrup failed to meet the conditions under Section 304 of the UIA and was therefore disqualified from receiving unemployment benefits. Accordingly, this claim of error also fails. In light of the foregoing, it is hereby

ORDERED that the decision in the matter *MARSHA JAGRUP v. JFLH.*, (V.I. App. No. 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) is AFFIRMED. It is further

ORDERED that Petitioner's Petition is DISMISSED WITH PREJUIDCE. It is further

ORDERED that this case is CLOSED.

DATED: February 2 1, 2024.

DOUGLAS A. BRADY, JUDGE

**ATTEST:** TAMARA CHARLES
Clerk of the Court

By: _____
Court Clerk/Supervisor

IN THE SUPERIOR COURT
OF THE VIRGIN ISLANDS

**FILED**

February 22, 2024 05:20 PM
SX-2016-CV-00068
TAMARA CHARLES
CLERK OF THE COURT

# IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
## District of St. Croix

**MARSHA JAGRUP,**

                    **Petitioner,**

**v.**

**JUAN F. LUIS HOSPITAL & MEDICAL
CENTER, et al.,**

                    **Respondents.**

Case Number: **SX-2016-CV-00068**
Action: **Writ of Review**

## NOTICE of ENTRY
## of
## JUDGMENT/ORDER

**To:**    Trudy Fenster, Esq.
       Michael R. Francisco, Esq., AAG

           **Please take notice that on February 22, 2024**
**a(n)** _____ MEMORANDUM OPINION AND ORDER _____
      **dated** _____ **February 21, 2024** _____ **was/were entered**
      **by the Clerk in the above-titled matter.**

**Dated:**   **February 22, 2024**

                                    **Tamara Charles**
                                  **Clerk of the Court**

**By:**

                                    **Cheryl Parris**
                                    **Court Clerk III**